UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MILTON MUSA PACHECO,

                                        Plaintiff,

                                                        9:06-CV-0020
v.                                                      (GTS/GHL)

CURTIS DROWN, et al.,

                                        Defendants.
_____

APPEARANCES:                                OF COUNSEL:

MILTON MUSA PACHECO, 79-B-0064
Plaintiff *pro se*
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821

HON. ANDREW M. CUOMO                        ROGER W. KINSEY, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
The Capitol
Albany, New York 12224

GEORGE H. LOWE, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

        This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby,

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff

Milton Musa Pacheco alleges that Defendants violated his civil rights by falsely accusing him of

forging a medical excuse pass, conducting a flawed and biased disciplinary hearing, confining

him to the Special Housing Unit ("SHU") under particularly harsh conditions, denying him

medical care while he was confined to the SHU, and either ignoring or mishandling his grievances about these issues.  Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56[1].  (Dkt. No. 68.)  For the reasons that follow, I recommend that Defendants' motion be granted except as to the retaliation claim against Defendants Mitchell and Fournia.

## I.   FACTUAL AND PROCEDURAL SUMMARY

At all relevant times, Plaintiff was an inmate at Clinton Correctional Facility.  Plaintiff had an operation on his right hand in October 2002.  (Am. Compl. ¶ 17, Dkt. No. 5.)  At the time he underwent his surgery, Plaintiff was assigned to a job as a porter in the bathhouse.  (Mitchell Aff. Ex. D at 4, Dkt. No. 68-28.)  On October 22, 2002, a nurse issued a medical excuse for Plaintiff, indicating that Plaintiff should not work.  (Mitchell Aff.¶ 10, Dkt. No. 68-24; Mitchell Aff. Ex. E, Dkt. No. 68-29.)  The excuse did not list an expiration date.  Although the medical excuse form included boxes to indicate that Plaintiff was allowed to participate in "any other activity" and "go to Mess Hall," the nurse did not check them.  *Id*.

Plaintiff alleges that while he was still healing and undergoing physical therapy, Defendant Correction Officer Brad Fournia told him that "if he did not get to work that he would be issued a misbehavior report."  (Am. Compl. ¶ 17, Dkt. No. 5.)

On December 2, 2002, the New York Court of Claims issued a decision in a case that Plaintiff had filed in 2001.  In that case, Plaintiff alleged that he had been wrongly confined to his cell for eight days pursuant to a "tuberculin hold."  Defendant Nurse Administrator John Mitchell

---

[1]      As Plaintiff notes (Dkt. No. 82 ¶ 7), Defendants' motion is erroneously listed on the docket as their "second" motion for summary judgment. The motion is, in fact, Defendants' first and only motion for summary judgment.

testified at the Court of Claims trial that he had reviewed Plaintiff's medical records and found no evidence that Plaintiff had been confined to his cell on a tuberculin hold, as Plaintiff alleged. The court found in Plaintiff's favor and awarded him $200.  In finding that Plaintiff had, as he alleged, been wrongfully confined to his cell on a tuberculin hold, the court stated that "[t]he testimony of Mr. Mitchell that there was no record of inmate Pacheco being on tuberculin hold during that time period is not dispositive."  (Pl.'s Ex. 7 at 3, Dkt. No. 76-3.)

On December 18, 2002,  Plaintiff stopped First Deputy Superintendent Dale Artus (not named as a Defendant in this case) as he was making rounds and told him that Defendant Fournia and other correction officers were forcing Plaintiff to perform his work duties against doctors' and nurses' orders.  (Am. Compl. ¶ 18, Dkt. No. 5; Mitchell Aff. Ex. D at 4, Dkt. No. 68-28.) Plaintiff followed up in writing with Artus, reiterating that correction officers were "rushing him back to work" and expressing concern that he would lose his job or be issued a misbehavior report for refusing to work.  (Mitchell Aff. Ex. D at 4, Dkt. No. 68-28.)

Artus referred Plaintiff's complaint to Defendant Mitchell.  (Mitchell Aff. Ex. D at 3, Dkt. No. 68-28.)  Defendant Mitchell responded in writing on December 30, 2002, stating "[n]o work until you are cleared by [outside consultant] Dr. Rubinovich."  (Mitchell Aff.¶ 9, Dkt. No. 68-24; Mitchell Aff. Ex. D. at 2, Dkt. No. 68-28.)

On January 9, 2003, Dr. Rubinovich saw Plaintiff.  (Mitchell Aff.¶ 12, Dkt. No. 68-24.) He did not clear Plaintiff to return to work.  (Mitchell Aff.¶ 14, Dkt. No. 68-24.)

On the morning of January 13, 2003, one of Defendant Fournia's duties was to ensure that inmates left the housing area and went to their programs or jobs unless they had permission

to miss them, were on sick call, or had some other official excuse[2].  (Fournia Aff.¶¶ 4-5, Dkt. No. 68-12.)  In an affidavit filed in support of Defendants' motion for summary judgment, Defendant Fournia states that "[o]n January 13, 2003, I was unaware of any medical excuse that exempted Plaintiff from work."  (Fournia Aff.¶ 6, Dkt. No. 68-12.)  On that date, he "reviewed a slip that purported to be a medical excuse for Plaintiff."  (Fournia Aff.¶ 7, Dkt. No. 68-12.)  The medical excuse was a temporary permit valid from December 30, 2002, to May 30, 2003.  It stated "no work.  May participate in any other activity.  May go to Mess Hall.  Showers in Block."  (Pl's Ex. 11, Dkt. No. 76-3.)  Defendant Fournia does not recall whether "the slip was delivered, handed to me or [whether] I simply encountered it on my desk."  (Fournia Aff.¶ 12, Dkt. No. 68-12.) Defendant Fournia noticed that the slip was not signed by the Captain[3] and that the signature of Defendant Mitchell did not look authentic.  (Fournia Aff.¶¶ 8-9, Dkt. No. 68-12.)  Defendant Fournia called Defendant Mitchell to confirm that Plaintiff had a medical permit excusing him from work.  (Fournia Aff.¶ 10, Dkt. No. 68-12; Mitchell Aff. ¶ 3, Dkt. No. 68-24.)  Defendant Mitchell told Defendant Fournia that the medical records indicated that Plaintiff had not been issued a permit.  Defendant Fournia sent the permit to Defendant Mitchell for review.  (Fournia Aff.¶ 11, Dkt. No. 68-12; Mitchell Aff.¶¶ 4-5, Dkt. No. 68-24.)  Upon review, Defendant Mitchell noted that the slip had not been signed by the Captain or logged in and that his own

---

[2]     Plaintiff asserts that Defendant Fournia, who worked a day shift, had no business ensuring that Plaintiff went to his job because he was assigned to work as a porter from 6:00 p.m. to 8:00 p.m.  (Pl.'s Mem. of Law in Supp. of Pl.'s Opp. to Defs.' Mot. for Summ. J. at 5, Dkt. No. 77.)

[3]     Fournia states that medical excuses are "normally" signed by the Captain. (Fournia Aff.¶ 8, Dkt. No. 68-12.)  The Court notes that Plaintiff's October 22, 2002, medical excuse, which all parties concede is authentic, was not signed by the Captain.

signature "was not authentic." (Mitchell Aff.¶¶ 5-6, Dkt. No. 68-24.) Based on these facts and

"the fact that only Plaintiff could benefit from the permit," Defendant Mitchell wrote a

misbehavior report charging Plaintiff with counterfeiting and possession of an altered item.

(Mitchell Aff.¶ 7, Dkt. No. 68-24; Mitchell Aff. Ex. B, Dkt. No. 68-26.)

On January 15, 2003, when Plaintiff was served with the misbehavior report, he requested

an assistant to help him review evidence and to defend himself against the charges in the report.

(Am. Compl. ¶ 23, Dkt. No. 5.) Plaintiff alleges that an unnamed correction officer told him that

the administrators from the Disciplinary Office had ordered that no assistance was to be assigned

to the case. *Id.* Plaintiff submitted a F.O.I.L. request seeking to review the documentary items in

possession of the Disciplinary Office, but the F.O.I.L request was denied. (Am. Compl. ¶ 24,

Dkt. No. 5.) From January 15, 2003, until January 24, 2003, Plaintiff alleges that he was unable

to collect and review any documentary evidence. *Id.*

Defendant Curtis Drown presided over Plaintiff's disciplinary hearing on January 24,

2003. (Am. Compl. ¶25, Dkt. No. 5; Drown Aff. Ex. B at 1, Dkt. No. 68-15.) At the beginning

of the hearing, Defendant Drown asked Plaintiff if he waived his right to assistance and Plaintiff

responded that he did not. (Am. Compl. ¶ 27, Dkt. No. 5; Drown Aff. Ex B at 1, Dkt. No. 68-

15.) Defendant Drown informed Plaintiff that because he was not confined or restricted pending

the hearing, he was not automatically entitled to assistance. (Drown Aff. Ex. B at 2, Dkt. No. 68-

15.)

Plaintiff informed Defendant Drown that he had not received a copy of the allegedly

forged medical excuse. (Drown Aff. Ex. B at 4, Dkt. No. 68-15.) Defendant Drown handed

Plaintiff a copy and adjourned the hearing for one minute while Plaintiff examined it, but refused

to give Plaintiff a copy to keep.  (Drown Aff. Ex. B at 6, Dkt. No. 68-15.)  Plaintiff stated that he

had never seen the slip before.  (Drown Aff. Ex. B. at 5-6, Dkt. No. 68-15.)  When Defendant

Drown asked him who, other than himself, could benefit from a forged medical excuse, Plaintiff

said that the officers could have forged it to retaliate against him. (Drown Aff. Ex. B at 11, Dkt.

No. 68-15.)  Plaintiff also stated that he had no motive to forge a medical pass because he already

had a legitimate medical excuse.  (Drown Aff. Ex. B at 19, Dkt. No. 68-15.)

Defendant Drown asked Plaintiff if he wanted to call any witnesses.  Plaintiff asked to

call a physical therapist, Dr. Rubinovich, the nurse who issued the October 2002 medical pass,

and Defendant Fournia. (Am. Compl. ¶ 32, Dkt. No. 5; Drown Aff. Ex. B at 12-15, Dkt. No. 68-

15.)  Plaintiff wanted to call the physical therapist to prove that Plaintiff's medical records were

with the therapist, rather than with Defendant Mitchell, on the morning of January 13.  (Drown

Aff. Ex. B at 13-14, Dkt. No. 68-15.)  Plaintiff wanted to call the nurse and Dr. Rubinovich to

prove that he was medically excused from working on January 13.  (Drown Aff. Ex. B. at 14-15,

Dkt. No. 68-15.)

Defendant Drown found that the testimony of Dr. Rubinovich and the nurse would be

only "minimally relevant" because the issue of whether or not Plaintiff was medically excused

from work could be resolved by reviewing Plaintiff's medical record.  He therefore denied

Plaintiff's request to call them as witnesses.  (Drown Aff. Ex. B at 25, 30, Dkt. No. 68-15.)

Defendant Drown denied Plaintiff's request to call the physical therapist.  In doing so, he

mischaracterized Plaintiff's request and stated that Plaintiff wanted the therapist to testify

"regarding your presence on January 14 when the date of January 14 was not the date the forgery

appeared but rather was the date the forgery was discovered."  (Drown Aff. Ex. C at 5, Dkt. No.

68-16.)

Defendant Fournia testified that he saw the medical excuse and an envelope on January 13. He stated that he did not remember how he received the medical excuse. He stated that the excuse had not been signed by the Captain, that Defendant Mitchell's signature did not look authentic, and that he notified the medical department. (Drown Aff. Ex. B at 17, Dkt. No. 68-15.)

Defendant Mitchell testified that his signature on the medical excuse was not authentic. (Drown Aff. Ex. B at 20-21, Dkt. No. 68-15.) He said he did not know whether Plaintiff had been cleared to work by Dr. Rubinovich "because I have to review his medical records." (Drown Aff. Ex. B at 21, Dkt. No. 68-15.) After reviewing the medical records, Defendant Mitchell confirmed that Plaintiff was still medically excused from working on January 13 and had not been cleared to return to work. (Drown Aff. Ex. B at 26, Dkt. No. 68-15.) In response to a question suggested by Plaintiff, Defendant Mitchell testified that he did not see Plaintiff falsify the document. (Drown Aff. Ex. B at 22, Dkt. No. 68-15.) During Defendant Mitchell's testimony, Defendant Drown noted the differences between the authentic October 22, 2002, medical excuse and the allegedly forged pass. (Drown Aff. Ex. B at 27, Dkt. No. 68-15.)

At the conclusion of the hearing, Defendant Drown found Plaintiff not guilty of possessing an altered item but guilty of counterfeiting. (Drown Aff. Ex. B at 30, Dkt. No. 68-15.) He immediately issued his written disposition. Defendant Drown stated, both orally and in his written disposition, that the evidence on which he had relied was the testimony of Fournia and Mitchell, statements from Plaintiff, the counterfeit pass, the letter from Defendant Fournia to Defendant Mitchell, and the envelope. (Am. Compl. ¶ 45, Dkt. No. 5; Drown Aff. Ex. C, Dkt.

7

No. 68-16.)   The disposition said "While I find it true that you were under 'no work' orders from medical, your own statements establish a reason for the forgery.  Since you were really the only person to gain from the forgery, the fact that you were not seen actually forging the document is not a deciding fact."  *Id*.  Defendant Drown sentenced Plaintiff to 90 days in the SHU with loss of packages, commissary, and phone privileges.  In addition, he sentenced Plaintiff to 90 days' loss of good time credits.  (Drown Aff. Ex. B at 31, Dkt. No. 68-15.)

Defendant Selsky affirmed Defendant Drown's disposition.  (Selsky Aff. Ex. E, Dkt. No. 68-39.)

Plaintiff alleges that the conditions he faced during his 90-day SHU confinement were more onerous than normal SHU conditions.  (Am. Compl. ¶ 51, Dkt. No. 5.)  Specifically, Plaintiff alleges that during his confinement in the SHU, correction officers handcuffed him whenever he was escorted off the block to any appointments.  He alleges that he suffered excruciating pain from the restraints because he had not completely healed from the surgery on his hand.  (Am. Compl. ¶ 51(a), Dkt. No. 5.)  He alleges that he was denied access to showers on February 1, 2003, February 8, 2003, February 22, 2003, and March 6, 2003.  (Am. Compl. ¶ 51(c), Dkt. No. 5.)  He alleges that he was denied access to all recreation and exercise on February 1, 2003, February 2, 2003, February 22, 2003, February 23, 2003, March 2, 2003, and March 6, 2003.  (Am. Compl. ¶ 51(d), Dkt. No. 5.)  He alleges that on February 3, 2003, the electricity in his cell was intentionally turned off.  (Am. Compl., ¶ 51(e), Dkt. No. 5.)  He alleges that on February 12, 2003, and February 13, 2003, the water to his sink and toilet were intentionally turned off.  (Am. Compl. ¶ 51(f), Dkt. No. 5.)  Plaintiff alleges that he was denied food trays on February 7, 2003, February 20, 2003, and March 7, 2003.  (Am. Compl. ¶ 51(g),

Dkt. No. 5.)  Plaintiff alleges that he was denied access to law books, legal supplies and other legal materials from the law library.  (Am. Compl. ¶ 51(h), Dkt. No. 5.)

Plaintiff's medical record shows that on February 6, 2003, Dr. Mobin Sadiq[4], a facility doctor, referred Plaintiff to Dr. Rubinovich for a follow-up appointment.  (Mitchell Aff.¶ 15, Dkt. No. 68-24; Mitchell Aff. Ex. H, Dkt. No. 68-32.)  As with all other such requests, the referral was reviewed by an outside third party contractor or out of area Regional Medical Director.  (Mitchell Aff. ¶ 16, Dkt. No. 68-24.)  Regional Medical Director Dr. Alexis Lang reviewed the request and found that further follow-up with Dr. Rubinovich was not necessary. (Mitchell Aff.¶ 17, Dkt. No. 68-24; Mitchell Aff. Ex. I, Dkt. No. 68-33.)  Defendant Dr. Robert Hentschel agreed with Dr. Lang and thus denied the request.  (Hentschel Aff.¶ 11, Dkt. No. 68-46.)

On January 5, 2006, Plaintiff filed the current action.  The operative complaint is the amended complaint filed on May 15, 2006.  (Dkt. No. 5.)  Defendants move for summary judgment.  (Dkt. No. 68.)  Plaintiff has opposed the motion.  (Dkt. Nos. 76-77.)

## II.    APPLICABLE LEGAL STANDARD

Defendants move for summary judgment.  Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

---

[4]      As discussed further below, portions of the body of the operative complaint refer to Dr. Sadiq as a defendant, but his name does not appear in the list of defendants in the "parties" section of the complaint, his name is not listed on the docket, and he has never been served with the complaint.

Civ. P. 56(c).  The party moving for summary judgment bears the initial burden of showing,

through the production of admissible evidence, that no genuine issue of material fact exists.

*Major League Baseball Properties, Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).  Only after

the moving party has met this burden is the non-moving party required to produce evidence

demonstrating that genuine issues of material fact exist.  *Salahuddin v. Goord*, 467 F.3d 263,

272-73 (2d Cir. 2006).  The nonmoving party must do more than "rest upon the mere allegations

. . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the

material facts."[5]  Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."[6]  In determining whether a

genuine issue of material[7] fact exists, the Court must resolve all ambiguities and draw all

reasonable inferences against the moving party.[8]

## III.   ANALYSIS

### A.   Official Capacity

Plaintiff names each Defendant in his individual and official capacity.  (Am. Compl. at 4,

Dkt. No. 5.)  Defendants argue that Plaintiff's claims against them in their official capacities are

---

[5]     *Matsushita*, 475 U.S. at 585-86; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading . . . .").

[6]     *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

[7]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[8]     *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

barred by the Eleventh Amendment.  (Defs. Memo of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' B.") at 27-29, Dkt. No. 68-8.)  Defendants are correct as to Plaintiff's claims for damages.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity."  *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana*, 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state.  *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf*, 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-06 (1984).

The Eleventh Amendment bars suits for damages against state officials acting in their official capacities.[9]  All DOCS employees are state officials for the purposes of the Eleventh

---

[9]       *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued.  To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . .  As such, it is no different from a suit against the State itself. . . .

Amendment. *See e.g. Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002); *Tolliver v. NY State Correctional Officers*, No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000)("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York*, 251 F.3d 84, 100 (2d Cir. 2001) (citation omitted); *see also* Fed. R. Civ. P. 12(h)(3).

Here, Defendants are all DOCS employees. Therefore, I recommend that the Court dismiss the claims for damages against Defendants in their official capacities.

### B.    Claims Regarding Misbehavior Report

#### 1.    Merits

Plaintiff alleges that Defendants Mitchell and Fournia retaliated against him by falsely accusing him of forging the medical pass. (Am. Compl. ¶¶ 11-21, Dkt. No. 5.) Defendants argue that the claim should be dismissed because Plaintiff was not subjectively chilled from exercising his First Amendment rights. (Defs.' B. at 6-7, Dkt. No. 68-8.) I find that Plaintiff has raised a genuine issue of material fact as to this issue.

A "prison inmate has no general constitutional right to be free from being falsely accused

---

We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky*, 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) [citing cases].

in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)).  The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

Claims of retaliation find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004).  To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action--in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 [2d. Cir. 2001]).  Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted)

Defendants do not dispute the first element of Plaintiff's retaliation claim: Plaintiff was engaged in protected conduct.  "Prisoners ... have a constitutional right of access to the courts and to petition the government for the redress of grievances," which includes the right to file state court actions and prison grievances. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). As to Defendant Mitchell, in 2001 Plaintiff had filed an action in the New York Court of Claims alleging that he had been wrongfully confined to his cell on a tuberculin hold.  At trial in the

Court of Claims, Plaintiff produced evidence showing that a DOCS Deputy Commissioner had written a letter acknowledging that Plaintiff had been "inadvertently returned to TB hold status," confined to his cell, and released eight days later.  In a decision issued on December 2, 2002, the Court of Claims noted that:

> [w]ithout addressing [the Deputy Commissioner's] letter, [the State] produced at trial John Mitchell, the Nurse Administrator at the Correctional Facility.  Nurse Mitchell testified that he reviewed the records pertaining to this case and could not see from such records that [Plaintiff] was put on tuberculin hold.  Additionally, the witness indicated that if [Plaintiff] was on tuberculin hold he would have been moved to another portion of the facility.  The Court credits [Plaintiff's] testimony that he was confined [for eight days].  The Court believes [as Plaintiff testified] that someone from the medical office came to [Plaintiff] in his cell ... to tell him that an administrative error led to his confinement.  This testimony is supported by the letter from [the Deputy Commissioner] which essentially corroborates that conversation.  *The testimony of Mr. Mitchell that there was no record of inmate Pacheco being on tuberculin hold during that time period is not dispositive.*

(Pl.'s Ex. 7 at 3, Dkt. No. 76-3.)

As to Defendant Fournia, in December 2002 Plaintiff filed grievances implicating Defendant Fournia in an alleged pattern of guards harassing him to work while he was recovering from surgery.  (Am. Compl. ¶ 18, Dkt. No. 5; Mitchell Aff. Ex. D, Dkt. No. 68-28.)  Therefore, Plaintiff was engaged in protected conduct.

Defendants argue that Plaintiff cannot establish the second element of his retaliation claim.  Defendants argue that Plaintiff has not raised a genuine issue of material fact that they took adverse action against him because "Plaintiff has simply failed to demonstrate any chill." (Defs.' B. at 7, Dkt. No. 68-8.)  Defendants essentially argue that this Court should apply a *subjective* test: was Plaintiff actually deterred from exercising his constitutional rights?

14

However, the Second Circuit defines adverse action in the prison context "*objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)(quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), *superceded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (emphasis in original).  The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381.

Here, resolving all ambiguities and drawing all inferences against Defendants as the moving parties, I find that a reasonable jury could conclude that Defendants took adverse action against Plaintiff.  The evidence shows that Plaintiff  was validly excused from working due to his surgery and thus had limited incentive to forge a medical excuse.  The evidence shows that the forged medical excuse was never seen in Plaintiff's possession, but rather was 'discovered' by Defendant Fournia.  The evidence shows that two weeks prior to this incident, Defendant Mitchell had personally confirmed in writing that Plaintiff was not cleared to work.  The evidence shows that Defendant Mitchell had previously reached an unreliable conclusion about what Plaintiff's medical record did or did not show and that this had been noted in a Court of Claims decision issued shortly before the forged medical pass appeared.  Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury *could* conclude that Defendants forged the medical excuse themselves and/or falsely accused Plaintiff of doing so.  Such actions could deter an individual of ordinary firmness from exercising his constitutional rights.  *See Gill*, 389 F.3d at 384 (the filing of false misbehavior reports by guards that resulted in a sentence of three weeks in keeplock would deter a prisoner of ordinary firmness from vindicating his constitutional

rights).  Therefore, Plaintiff has raised a genuine issue of material fact that Defendants Mitchell

and Fournia took adverse action against him[10].

Finally, Plaintiff has raised a genuine issue of material fact that there was a causal

connection between his protected conduct and the misbehavior report.  Indeed, Defendants have

offered no analysis whatsoever in support of their wholly conclusory argument that Plaintiff "has

not provided any proof of a casual (sic) connection."  (Defs.' B at 7, Dkt. No. 68-8.)  "A plaintiff

can establish a causal connection that suggests retaliation by showing that protected activity was

close in time to the adverse action."  *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).  Here,

the misbehavior report was issued within six weeks of the Court of Claims decision and

Plaintiff's complaint to Artus that implicated Defendant Fournia.  Therefore, I find that Plaintiff

has raised a genuine issue of fact that Defendants Mitchell and Fournia retaliated against him.

## 2.    Physical Injury Requirement

Defendants argue that Plaintiff's retaliation claim should be dismissed because he fails to

allege a physical injury as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. §

1997(e).  (Defs.' B. at 27, Dkt. No. 68-8.)  42 U.S.C. § 1997e(e) provides that prisoners cannot

bring federal civil actions "for mental or emotional injury suffered while in custody without a

---

[10]    I recognize that this recommendation may appear to contradict my finding in
Section III(C)(2) that Defendant Drown did not act arbitrarily in finding that Plaintiff was guilty
of counterfeiting.  The difference is in the standard of review.  In determining whether Defendant
Drown's decision was arbitrary, I am required to uphold the disciplinary sentence if it was
supported by "some evidence," which is a very deferential standard of review.  On the other
hand, in determining whether Plaintiff has raised a genuine issue of material fact that Defendants
took adverse action against him, I must resolve all ambiguities and draw all inferences against
Defendants.  Having extensively reviewed the record and resolved the myriad ambiguities and
inferences in Plaintiff's favor, I find that there is sufficient evidence for Plaintiff's retaliation
claim to reach a jury.

prior showing of physical injury."  Here, Plaintiff's retaliation claim is not a claim "for mental or emotional injury."  Rather, he alleges that Defendants violated his First Amendment rights. *Auleta v. LaFrance*, 233 F. Supp. 2d 396, 403 (N.D.N.Y. 2002); *Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 138 (S.D.N.Y. 2002) (holding that 42 U.S.C. § 1997e(e) does not apply to actions alleging First Amendment violations).  Therefore, Plaintiff's retaliation claim is not barred by 42 U.S.C. § 1997e(e).

> 3.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  Specifically, Defendants argue that Defendant Mitchell is entitled to qualified immunity because he "was in a position to tell whether or not the signature was his and reasonablely (sic) believed that since Plaintiff was the only person who could benefit from the forgery, Plaintiff was the person who manufactured the medical pass."  (Defs.' B. at 25, Dkt. No. 68-8.)

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 [1982]).  As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."  *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) [citations omitted], *accord*, *Higazy v. Templeton*, 505 F.3d 161, 169, n.8 (2d Cir. 2007) [citations omitted].  Courts may exercise their sound discretion in deciding which of the two

prongs should be addressed first, in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 129 S.Ct. 808, 817 (2009).

Here, as discussed above, the facts when viewed in the light most favorable to Plaintiff could establish a constitutional violation.  In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity';
> (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) [citations omitted], *cert. denied*, 503 U.S. 962 (1992).[11]  "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful."  *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) [citations omitted].[12]  This "objective reasonableness" part of the test is met if

---

[11]     *See also Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir. 2005); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir. 1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir. 1996); *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994); *Calhoun v. New York State Division of Parole*, 999 F.2d 647, 654 (2d Cir. 1993).

[12]     *See also Anderson v. Creighton*, 483 U.S. 635, 639 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.'") [citation omitted]; *Davis v. Scherer*, 468 U.S. 183, 190 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable

"officers of reasonable competence could disagree on [the legality of defendant's actions]."

*Malley v. Briggs*, 475 U.S. 335, 341 (1986).[13]

Here, the facts discussed above that raise a triable issue as to whether Defendants

Mitchell and Fournia took adverse action against Plaintiff also raise a triable issue that

Defendants Mitchell and Fournia did not believe, actually or reasonably, that Plaintiff forged the

medical excuse. Therefore, Defendants are not entitled to qualified immunity and I recommend

that their motion for summary judgment on this ground be denied.

### C.    Claims Regarding Disciplinary Hearing

Plaintiff alleges that Defendant Drown violated his right to due process by conducting a

flawed and unfair disciplinary hearing. (Am. Compl. ¶¶ 25-50, Dkt. No. 5.) Defendants move

for summary judgment of this claim, arguing that (1) it is barred by the rule in *Heck v.*

*Humphrey*; and (2) Plaintiff has not raised a genuine issue of material fact that he was deprived

of a liberty interest or denied due process. (Defs.' B. at 3-6, 9-10, Dkt. No. 68-8.)

### 1.    *Heck v. Humphrey*

Defendants argue that Plaintiff's claims regarding the disciplinary hearing are barred by

the rule in *Heck v. Humphrey*, 512 U.S. 477 (1994). (Defs.' B. at 3-6, Dkt. No. 68-8.)

Defendants are incorrect.

In *Heck*, the Supreme Court held that "in order to recover damages for [an] allegedly

---

standard."); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects
defendants "even where the rights were clearly established, if it was objectively reasonable for
defendants to believe that their acts did not violate those rights").

[13]    *See also Malsh v. Correctional Officer Austin*, 901 F. Supp. 757, 764 (S.D.N.Y.
1995) [citing cases]; *Ramirez v. Holmes*, 921 F. Supp. 204, 211 (S.D.N.Y. 1996).

unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of *habeas corpus*." *Heck*, 512 U.S. at 486-87.

In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court extended the *Heck* rule to prisoners' challenges to prison disciplinary proceedings that resulted in a loss of good time credits. The Court held that a prisoner seeking damages and declaratory relief regarding procedures used in a disciplinary hearing that resulted in a loss of good time credit is required to show that the disciplinary sentence has been reversed, declared invalid, or called into question by a federal court.

In October 2006, after Plaintiff filed the operative complaint, the Second Circuit softened the *Heck/Edwards* rule somewhat by holding that "a prisoner can, without demonstrating that the challenged disciplinary proceedings or resulting punishments have been invalidated, proceed separately with a § 1983 action aimed at the sanctions or procedures that affected the conditions of his confinement ... if he agrees to abandon forever any and all claims he has with respect to the sanctions that affected the length of his imprisonment." *Peralta v. Vasquez*, 467 F.3d 98, 100 (2d Cir. 2006).

Plaintiff explicitly states in his operative complaint that he is not challenging his loss of good time credits. (Am. Compl. at 50, Dkt. No. 5.) On December 21, 2006, this Court applied *Peralta* to Plaintiff's case and, noting that Plaintiff had forever abandoned any and all claims he may have had regarding his loss of good time credits, allowed Plaintiff to proceed with this

action without complying with the *Heck/Edwards* rule[14].  (Dkt. No. 12 at 3-4.)  Therefore, I recommend that the Court find (once again) that Plaintiff's claims regarding his disciplinary hearing and subsequent SHU confinement are not barred by the *Heck* rule.

        2.    <u>Merits</u>

Defendants argue that Plaintiff cannot establish that Defendant Drown violated his due process rights because (1) Plaintiff was not deprived of a cognizable liberty interest; and (2) Plaintiff received all of the process constitutionally due.  (Defs.' B. at 9-14, Dkt. No. 68-8.)  I find that although Plaintiff has raised a genuine issue of material fact that he was deprived of a liberty interest, he received all of the process constitutionally due.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law.  *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Tellier*, 280 F.3d at 80; *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).  Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU."  *Palmer v. Richards*, 364

---

[14]    Defendants characterize the Court's order as ruling that "because Plaintiff's disciplinary sentence involved a loss of good-time and has not been overturned, Plaintiff simply cannot state a cause of action for an alleged loss of due process."  (Defs.' B. at 3-4, Dkt. No. 68-8.)  The order, in fact, says precisely the opposite: it states that Plaintiff *can* proceed with his due process claim because he abandoned his right to challenge the loss of good time credits.

F.3d 60, 64 n.2 (2d Cir. 2004).  The issue, then, is whether Plaintiff's SHU confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

In the Second Circuit, determining whether a disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement."  *Palmer*, 364 F.3d at 64. Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions[15]."  *Palmer*, 364 F.3d at 65.  For confinements of an "intermediate duration - between 101 and 305 days - development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required."  *Palmer*, 364 F.3d at 64-65. Disciplinary segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life."  *Palmer*, 364 F.3d at 65 (quoting *Colon v. Howard*, 215 F.3d 227,  231 (2d Cir. 2000)).

Here, Plaintiff was confined in the SHU for 90 days.  To survive summary judgment, then, Plaintiff must raise a triable issue that the conditions he experienced were more severe than normal SHU conditions.  Plaintiff has done so.  Plaintiff has filed an affidavit stating that, while in the SHU, he was handcuffed every time he left his cell resulting in severe pain to his injured wrist, he was denied showers and outside exercise, the electricity and water in his cell were

---

[15]        "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week.  *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004).

turned off, and he was denied food trays.  (Pl.'s Aff. in Opp. to Defs.' Mot. for Summ. J. at 20-

21, Dkt. No. 76.)  Plaintiff's own testimony regarding his conditions of confinement in the SHU

is sufficient to raise a genuine issue of material fact.  *Davis v. Barrett*, ___ F.3d ___, No. 08-

0479 CV, 2009 U.S. App. LEXIS 17641, at *13-14, 2009 WL 2411811, at *4 (2d Cir. Aug. 7,

2009); *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

        Having found that Plaintiff has raised a genuine issue of fact that he was deprived of a

liberty interest, I now turn to the issue of whether Plaintiff received all of the process due at this

disciplinary hearing.  Due process is satisfied if an inmate facing disciplinary charges receives (1)

advanced written notice of the charges against him; (2) a hearing affording him a reasonable

opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing

officer; and (4) a written statement of the disposition, including the evidence relied upon and the

reasons for the disciplinary actions taken*.  Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974);

*Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).  In some circumstances, such as where the

inmate is illiterate or where the complexity of an issue makes it unlikely that the inmate will be

able to collect and present the evidence necessary for an adequate comprehension of the case, an

inmate may also be entitled to the assistance from another inmate or from prison staff in

preparing his defense.  *Id*. at 570.

        Plaintiff alleges that he did not receive fair notice because he was never allowed to see

the envelope that Defendant Fournia testified to seeing or the letter that Defendant Fournia sent

to Defendant Mitchell along with the forged medical excuse.  (Am. Compl. ¶¶ 46-47, Dkt. No.

5.)  Plaintiff received fair notice.  Fair notice requires the charging officer "to be sufficiently

specific as to the misconduct with which the inmate is charged to inform the inmate of what he is

accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report."  *Taylor v. Rodriguez*, 238 F.3d 188, 192-93 (2d Cir. 2001) (punctuation and citation omitted).  Here, the misbehavior report was sufficiently specific to allow Plaintiff to prepare a defense.

Plaintiff alleges that he was denied the opportunity to call the physical therapist and Dr. Rubinovich as witnesses[16].  (Am. Compl. ¶¶ 32-34, Dkt. No. 5.)  An inmate's right to call witnesses is not the same as a defendant's in a criminal trial, but rather is qualified by the circumstances of prison life.  *Wolff*, 418 U.S. at 566-67.  The Supreme Court has stated that disciplinary hearing officers must have the discretion to deny witnesses, noting that valid bases for the denial of witnesses would include irrelevance, lack of necessity, and other hazards particular to each case.  *Id*.  Here, Dr. Rubinovich's testimony was not necessary because Defendant Drown was able to conclude from Plaintiff's medical records that, contrary to Defendant Mitchell's assertion when Defendant Fournia made his initial inquiry, Plaintiff had a valid medical slip excusing him from work.  The physical therapist's testimony was not necessary because Defendant Drown could have concluded on the evidence before him that Defendant Mitchell did not, in fact, review Plaintiff's medical record on January 13.  Thus, Defendant Drown's refusal to allow Plaintiff to call these witnesses did not violate Plaintiff's right to due process.

Plaintiff argues that Defendant Drown was not impartial.  (Am.Compl. ¶ 50, Dkt. No. 5; Pl.'s Stmt. of Disputed Material Factual Issues at 17, Dkt. No. 76-2 at 17.)  It is well settled "that

---

[16]     Plaintiff's operative complaint does not mention Defendant Drown's refusal to allow Plaintiff to call the nurse who wrote the October 22, 2002, medical excuse as a witness. (Am. Compl. ¶¶ 32-36, Dkt. No. 5.)

the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y.2002) (citing *Francis v.. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989)).  Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571.  A decision is not "arbitrary" if it is supported by "some evidence."  *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).  "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling."  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)).  Under this extremely tolerant standard, Defendant Drown's decision was supported by "some evidence."  Defendant Drown found Plaintiff guilty of counterfeiting because Plaintiff was "really the only person to gain from the forgery."  (Drown Aff. Ex. C at 3, Dkt. No. 68-16.)  The evidence showed that the forged medical excuse explicitly allowed Plaintiff privileges - the ability to go to Mess Hall, participate in other activities, and shower on the Block - that the legitimate medical excuse did not.  Thus, the evidence does not show that Defendant Drown was biased.

Plaintiff alleges that he was wrongly denied assistance for preparing his defense.  (Am. Compl. ¶ 27, Dkt. No. 5.)  As noted above, inmates are only constitutionally entitled to such assistance in limited circumstances, such as where the inmate is illiterate or where the complexity of an issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case.  These circumstances were not present in this case.

Defendant Drown provided Plaintiff with due process at his disciplinary hearing.

25

Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's due process claims.

### D.      Claims Regarding SHU Conditions

Plaintiff alleges that his conditions of confinement in the SHU violated his Eighth Amendment rights.  (Am. Compl. ¶ 51, Dkt. No. 5.)  Defendants argue that this claim should be dismissed because (1) Plaintiff failed to exhaust his administrative remedies (Defs.' B. at 18-21, Dkt. No. 68-8); and (2) Plaintiff has not raised a genuine issue of material fact that Defendants were personally involved in any of the alleged deprivations (Defs.' B. at 15-16, Dkt. No. 68-8).

#### 1.      Exhaustion of Administrative Remedies

Defendants argue that "Plaintiff simply did not bother to file any grievance concerning the conditions of confinement he now seeks to raise in his complaint.  Plaintiff's prolific and ongoing grievance history amply demonstrates that he well knows the process and procedure, however, there is no hint he ever filed any grievance about his term in SHU or the conditions in 2003."  (Defs. B. at 21, Dkt. No. 68-8.)  This issue is far more factually complex than Defendants' brief would lead one to believe.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under §1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[17]  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege

---

[17]      42 U.S.C. § 1997e.

excessive force or some other wrong."[18]  The Department of Correctional Services ("DOCS") has

available a well-established three-step inmate grievance program.[19]

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following

procedure for the filing of grievances.[20]  First, an inmate must file a complaint with the facility's

IGP clerk within twenty-one (21) calendar days of the alleged occurrence.  If a grievance

complaint form is not readily available, a complaint may be submitted on plain paper.  A

representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16)

calendar days from receipt of the grievance to informally resolve the issue.  If there is no such

informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of

receipt of the grievance, and issues a written decision within two (2) working days of the

conclusion of the hearing.  Second, a grievant may appeal the IGRC decision to the facility's

superintendent within seven (7) calendar days of receipt of the IGRC's written decision.  The

superintendent is to issue a written decision within twenty (20) calendar days of receipt of the

grievant's appeal.  Third, a grievant may appeal to the central office review committee

("CORC") within seven (7) working days of receipt of the superintendent's written decision.

CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal.  It

is important to note that any failure by the IGRC or the superintendent to timely respond to a

grievance or first-level appeal, respectively, can be appealed to the next level, including CORC,

---

[18]     *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

[19]     7 N.Y.C.R.R. § 701.7.

[20]     7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York*, 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

to complete the grievance process.[21]

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process.  In fact, the regulations specifically state that the results of disciplinary hearings are "non-grievable."  N.Y. Comp. Codes R. & Regs. tit.7, § 701.3(e)(1)-(2).  For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an  appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8.  The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition.  N.Y. Comp. Codes R. & Regs. tit.7, § 254.8.

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies.  *Woodford v. Ngo*, 548 U.S. 81 (2006).  For example, "courts consistently have found that CORC's dismissal of a grievance as untimely constitutes failure to exhaust available administrative remedies."  *Soto v. Belcher*, 339 F. Supp. 2d 592, 595 (S.D.N.Y. 2004).  However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust

---

[21]     7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York*, 198 F. Supp.2d 546, 549 (S.D.N.Y. 2002), *vacated and remanded on other grounds*, 380 F.3d 680 (2d Cir. 2004); *see, e.g., Croswell v. McCoy*, 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F. Supp.2d 431, 433 (W.D.N.Y. 2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver*, 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

his available administrative remedies, as required by the PLRA.[22]

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[23]   Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[24]   Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[25]

Here, Plaintiff prepared a grievance dated April 21, 2003.  In the first sentence, he stated that he had been moved to the SHU "as a result of a bogus misbehavior report."  In the body of the grievance, he complained of the conditions of confinement that are the subject of his Eighth Amendment claim.  (Pl.'s Ex. 35 at 41-42, Dkt. No. 76-4.)  Plaintiff states that the IGRC Supervisor rejected the grievance on May 7, 2003, on the grounds that complaints regarding

---

[22]        *See Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).  The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford.  Chavis v. Goord*, No. 07-4787-pr, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

[23]        *Hemphill*, 380 F.3d at 686 (citation omitted).

[24]        *Id.* [citations omitted].

[25]        *Id*. [citations and internal quotations omitted].

disciplinary issues are non-grievable and should instead be pursued through an appeal of the disciplinary sentence.  (Pl.'s Aff. in Opp. to Defs.' Mot. for Summ. J. ¶ 56, Dkt. No. 76.)  At that point, it was too late for Plaintiff to raise the issues regarding SHU conditions in an appeal of his disciplinary sentence because such appeals must be filed within 30 days of receipt of the hearing officer's written disposition.  N.Y. Comp. Codes R. & Regs. tit. 7, § 254.8.  Plaintiff received Defendant Drown's written disposition on January 24, 2003.  (Drown Aff. Ex. C, Dkt. No. 68-16.)  Plaintiff was thus required to file any appeal by February 24, 2003.  It is unclear how Plaintiff could have complained of the denial of showers, exercise, and food that he alleges occurred on March 6 and 7, 2003, in a document that was required to be filed by February 24, 2003.

Two years later, in March 2005, Plaintiff wrote to DOCS Commissioner Goord, stating that the IGRC's refusal to accept grievances about 'non-grievable' issues had placed him in a "Catch 22" in which he was required to, but could not, exhaust his administrative remedies. Plaintiff did not refer specifically to his April 21, 2003, grievance and did not specify what 'non-grievable' issue he wanted the IGRC to address.  (Pl.'s Ex. 45 at 2-3, Dkt. No. 76-5.) Commissioner Goord's office responded on March 28, 2005, instructing Plaintiff to "submit your grievance or appeal directly to the Grievance Clerk at the facility."  (Pl.'s Ex. 45 at 4, Dkt. No. 76-5.)  Plaintiff responded on March 31, 2005, stating that he would "file another grievance complaint with the Clinton Corr. Fac. IGRC to see if they will process it."  (Pl.'s Ex. 45 at 5-6, Dkt. No. 76-5.)

On June 10, 2005, Plaintif submitted another grievance.  CORC denied it as untimely. (Bellamy Aff. Ex. A, Dkt. No. 68-11.)  Neither party has provided the Court with a copy of this

grievance.

On February 27, 2006, Plaintiff filed a grievance regarding the conditions of confinement he experienced in the SHU in 2003.  (Pl.'s Ex. 51, Dkt. No. 76-5.)  CORC denied the grievance as untimely on April 12, 2006.  (Bellamy Aff., Dkt. No. 68-11, Ex. A.)

Because Plaintiff did not receive a decision from CORC on the merits of his grievances regarding SHU conditions, he did not properly exhaust his administrative remedies.  However, applying the *Hemphill* factors, there is at least a genuine issue of material fact as to whether Defendants are estopped from asserting Plaintiff's failure to exhaust administrative remedies as a defense or whether special circumstances plausibly justify Plaintiff's failure to exhaust.  Plaintiff filed a timely grievance, which was incorrectly rejected as a complaint about a "non-grievable" issue.  It is not clear why Plaintiff waited two years to raise the issue with Commissioner Goord, but there is an inference from his letter to Goord that Plaintiff unsuccessfully attempted several times during that period to file a grievance regarding the SHU conditions.  In any event, Defendants' assertion that "Plaintiff simply did not bother to file any grievance concerning the conditions of confinement" is simply not true and I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on this issue. Therefore, I recommend that the Court reject Defendants' argument that Plaintiff failed to exhaust his administrative remedies.

2.    Merits

Defendants argue that Plaintiff's conditions of confinement claim should be dismissed because there is no evidence that any Defendant was personally involved in any of the alleged deprivations.  (Defs.' B. at 15-16, Dkt. No. 68-8.)  Defendants are correct.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]).[26]  Here, Plaintiff does not allege, and the evidence does not show, that any of the named Defendants were involved in any way with the deprivations Plaintiff allegedly experienced in the SHU.  Plaintiff argues that Defendant Drown was personally involved because Plaintiff was placed in the SHU as a result of Defendant Drown's disposition at the disciplinary hearing.  (Dkt. No. 76 ¶ 42.)  Even if this were sufficient to show that Defendant Drown was personally involved, it would be insufficient to establish the subjective element of an Eighth Amendment conditions of confinement claim.  A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  There is no evidence that Defendant Drown was aware of facts from which he could draw the inference that Plaintiff would be subjected to the allegedly unconstitutional conditions of confinement in the SHU, must less that he actually drew such an inference.  Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's conditions of confinement claim.

E.     **Claims Regarding Medical Care**

Plaintiff alleges that Defendants Mario De Azevedo, Robert Hentschel, and Marshall

---

[26]     *Accord*, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978); *Gill v. Mooney*, 824 F2d 192, 196 (2d Cir. 1987).

Trabout violated his Eighth Amendment rights by cancelling his March 2003 follow-up appointment with Dr. Rubinovich.  Defendants argue that this claim should be dismissed because (1) De Azevedo and Trabout were not personally involved in the decision to cancel the follow-up appointment; and (2) Dr. Hentschel was not deliberately indifferent.  (Defs.' B. at 16-18, 21-22, Dkt. No. 68-8.)  Defendants are correct.

As discussed above, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]).[27]  Here, it is undisputed that Defendants De Azevedo and Trabout had no involvement in Plaintiff's care while he was confined at Clinton Correctional Facility.  (De Azevedo Aff.¶¶ 3-4, Dkt. No. 68-17; Trabout Aff.¶¶ 5-9, Dkt. No. 68-21.)  Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants De Azevedo and Trabout.

As to Defendant Hentschel, Plaintiff has not raised a genuine issue of material fact that he violated Plaintiff's Eighth Amendment right to adequate medical care.  The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments.  The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a

---

[27]    *Accord*, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978); *Gill v. Mooney*, 824 F2d 192, 196 (2d Cir. 1987).

maturing society." *Estelle*, 429 U.S. at 102.  Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  This duty includes the obligation to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component.  *Farmer*, 511 U.S. at 834.  To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

To prove the objective element of an Eighth Amendment medical care claim, a prisoner must show that he suffered from "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) [citations omitted], *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996), *cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain.  *Chance*, 143 F.3d at 702-03.

To satisfy the subjective component, the defendant's behavior must be "wanton."  What is considered "wanton" must be determined with "due regard for differences in the kind of

34

conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). Where a prisoner claims that a defendant provided inadequate medical care or conditions of confinement, he must show that the defendant acted with "deliberate indifference." *Estelle*, 429 U.S. at 105; *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d, 698, 703 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. 825, 835; *Ross v. Giambruno*, 112 F.3d 505 (2d Cir. 1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

Dr. Hentschel declares that his decision to cancel Plaintiff's March 2003 follow-up

appointment with outside consultant Dr. Rubinovich "was predicated on extensive discussions with [Regional Medical Director] Dr. Lang, the facility, [and a] nurse scheduler." (Hentschel Aff.¶ 12, Dkt. No. 68-46[28].)  It was Dr. Hentschel's "medical opinion, based upon the record, that Plaintiff's medical needs were being adequately addressed at the facility level." (Hentschel Aff.¶ 13, Dkt. No. 68-46.)  Plaintiff has produced no evidence suggesting that Dr. Hentschel's decision even amounted to medical malpractice, much less a constitutional violation.  Therefore, I recommend that the Court grant Defendants' motion for summary judgment on this issue and dismiss Plaintiff's Eighth Amendment claims regarding the cancellation of his March 2003 follow-up appointment with Dr. Rubinovich.

### F.     Claims Regarding Grievances

#### 1.     Grievances Regarding Misbehavior Report/ SHU

Plaintiff alleges that Defendant Selsky failed to adequately respond to his grievances regarding the misbehavior report and disciplinary hearing.  (Am. Compl. ¶¶ 53-57, Dkt. No. 5.) Plaintiff contends that Selsky should not have affirmed Defendant Drown's disposition because it was not supported by sufficient evidence.  As discussed above, Defendant Drown's disposition was supported by "some evidence," which is sufficient.  Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claims against Defendant Selsky.

---

[28]     The copy of Dr. Hentschel's affidavit originally filed with the Court was missing the second of three pages.  Court staff contacted defense counsel to correct this error, instructing counsel to electronically file and serve on Plaintiff a copy of the second page.  In response, Defendants filed the missing second page.  Plaintiff received a copy.  In two letters filed with the Court since that time, Plaintiff objects to this correction of clerical error.  (Dkt. Nos. 82 and 83.) Plaintiff's letters do not include any objections to the substance Dr. Hentschel's affidavit.  I have therefore considered the affidavit in its entirety.

2.      Grievances Regarding Medical Care

Plaintiff alleges that Defendants Mitchell and Wright failed to respond to his grievance

regarding the denial of a March 2003 follow-up appointment with Dr. Rubinovich.  (Am. Compl.

¶¶ 60-61, Dkt. No. 5.)  A prisoner's allegation that a supervisory official failed to respond to a

grievance is insufficient to establish that the official "failed to remedy that violation after

learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act

on information indicating that the violation was occurring."  *Rivera v. Goord*, 119 F. Supp. 2d

327, 344-45 (S.D.N.Y. 2000).  *See also Watson v. McGinnis,* 964 F. Supp. 127, 130 (S.D.N.Y.

1997)("The law is clear that allegations that an official ignored a prisoner's letter are insufficient

to establish liability.").  Therefore, I recommend that the Court grant Defendants' motion for

summary judgment and dismiss all claims against Defendant Wright and the failure-to-respond

claim against Defendant Mitchell.

G.      **Claims Against Doe Defendants**

Plaintiff's complaint lists several John and Jane Doe Defendants.  (Am. Compl. at 4, Dkt.

No. 5.)  Defendants argue that the Doe Defendants should be dismissed because they were never

served.  (Dkt. No. 68-8 at 1 n.1.)  Defendants are correct.  In addition, I note that Paragraph 61 of

the operative complaint refers to Dr. Mobin Sadiq and Dr. Kang Lee as defendants.  These

individuals were not listed in the "parties" section of the operative complaint, listed on the

docket, or served.

Under the Federal Rules of Civil Procedure, a defendant must be served with the

summons and complaint within ***120 days*** after the filing of the complaint.  Fed. R. Civ. P. 4(m).

This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice

(and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within **sixty (60) days** of the filing of the complaint.  N.D.N.Y. L.R. 4.1(b) [emphasis added].  Here, more than 120 days have elapsed since the filing of the complaint and the Doe Defendants, Dr. Sadiq, and Dr. Lee have not been served.  As a result, Plaintiff is in violation of both the Federal Rules of Civil Procedure and the Local Rules of Practice for this Court.  I therefore recommend that all claims against the Doe Defendants and any claims against Dr. Sadiq and Dr. Lee be dismissed.

      **ACCORDINGLY**, it is

      **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 68) be **GRANTED IN PART AND DENIED IN PART**.  It is recommended that Defendants' motion be granted and all of Plaintiff's claims be dismissed *except* the claim that Defendants Mitchell and Fournia retaliated against Plaintiff for exercising his First Amendment rights.  In addition, any claims for damages against Defendants Mitchell and Fournia in their official capacities should be dismissed as barred by the Eleventh Amendment.

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: September 2, 2009
      Syracuse, New York

George H. Lowe
United States Magistrate Judge

38